IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|                     |   |                              |
|---------------------|---|------------------------------|
| BEVERLY E. LOEW     | : |                              |
|                     | : |                              |
| v.                  | : | Civil Action No. DKC 19-3352 |
|                     | : |                              |
| DAI GLOBAL, LLC     | : |                              |
|                     | : |                              |

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this diversity breach of contract/failure to hire action is the motion to dismiss filed by Defendant DAI Global, LLC ("DAI"). (ECF No. 22). The issues have been briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, the motion to dismiss will be granted in part and denied in part.

**I.   Background**

Unless otherwise noted, the following facts are set forth in the complaint. Plaintiff Beverly E. Loew ("Ms. Loew") is an attorney and legal consultant who lives and works in Arlington County, Virginia. DAI is a consultancy working in economic development and public health. It has its principal place of business in Bethesda Maryland, and each of its members is incorporated under Delaware law (ECF No. 12), so it is a citizen of both Delaware and Maryland.

Sometime prior to Spring 2016, Ms. Loew and a former colleague named Robert Bond ("Dr. Bond")[1] began to speak about a master contract ("task order") set to be released by the United States Agency for International Development ("USAID"), soliciting bids for a project in Ukraine.  The project was to incorporate and extend government work already done and "was expected to include . . . technical assistance on non-bank financial topics on which [Plaintiff] was among the few known authorities available."  Dr. Bond believed Ms. Loew could add to a proposal in seeking the award for a firm and invited her to collaborate.  In return, Ms. Loew alleges, he agreed that Ms. Loew would be "compensated for her work on the proposal with a position on the task order if it was awarded to the firm with which Bond was working."

Relying on this promise, she spent the next two months working "on spec[ulation]," which appears to be industry jargon for working for free, but with the prospect of future employment on that work. Under the terms required by USAID, she was listed as an "essential personnel" on the task order.  She said the consideration for this work "was understood to be compensation for the days she worked on [the] task order at a market rate that was consistent with her

---

[1] Ms. Loew alleges a number of additional (though mostly ancillary) facts in the first fifteen pages of her opposition that do not appear in her complaint and thus are not properly before the court.  (ECF No. 28-1).  However, she does begin referring to Robert Bond as "Dr. Bond" instead of merely "Bond," and so this honorific with be used throughout.

market value adjusted" but "adjusted downward to the highest 'fully burdened' rate USAID would permit for a person" of Ms. Loew's skill and experience.  Dr. Bond hoped to work with his current firm on the bid, but, when the request from USAID was released on April 22, 2016, his firm was not invited to bid.  Because of this, Dr. Bond sought and secured release from that firm to partner with a different firm that was invited to bid on submitting a proposal.

It was not until May 5, 2016 that Dr. Bond told Ms. Loew that he had agreed to work with DAI in "spearheading their proposal." Up until that date, little substantive work seems to have taken place on the proposal.  Plaintiff states, "[i]t was not well-known at the time that he was available *to develop* a proposal for the new USAID financial sector work."  (emphasis added).  Nor was Dr. Bond's only apparent progress on the proposal well known: he had "locked down" "key personal," including himself and two Ukrainian professionals, as well as "essential personnel," including Ms. Loew and "four or five" other US expatriate professionals "to work on the proposal."   It was after DAI officially engaged Dr. Bond and his team that Ms. Loew and Dr. Bond began exchanging ideas on the specifics of that proposal together.  Subsequently, DAI reached out to "conduct the due diligence" USAID required of it before putting her forward as part of the proposal.  She says that both DAI and Dr. Bond, as their agent, sought to craft a "statement of work" that would define her role within the proposal, and by

extension, the project. She contributed in various ways to this joint effort. In particular, she "provided responses to all technical issues addressed to her." She also "wrote proposal components for a large portion of the non-bank financial sector work" contained therein. Ms. Loew says that she was careful to draft her portions of the proposal, particularly its "analysis" component, in a way to make it easy to incorporate it into the eventual work plan. She alleges that, as their team made USAID's short list, she worked with Dr. Bond to address "key issues USAID raised" with respect to the original proposal. Ms. Loew alleges that, as selection neared, Dr. Bond wrote to her, "we would be sunk without you." Ultimately, DAI won the bid and were awarded the task order in mid-October.

Ms. Loew says she was told (presumably by an employee at DAI) not to make plans for Thanksgiving as she was one of the U.S. expatriates designated as "essential personnel." They were to be "mobilized" (presumably to Kyiv) once Dr. Bond, the "Chief of Party," could get USAID's approval. Periodically she was asked by Dr. Bond to edit and provide revisions to her statement of work. Somewhat ambiguously, Plaintiff alleges that, when she asked a DAI employee named Zoe Benezet-Parsons ("Ms. Benezet-Parsons") in Kyiv to a commit on dates for the project, she "demurred." Plaintiff continues, however, to explain that she herself had reservations about committing to any dates.

4

She was never offered a formal consulting or employment agreement throughout these discussions. She says that, once the news of the award went public, she tried to see if such an agreement was forthcoming, but "was rebuffed" by Dr. Bond. She states that when Ms. Benezet-Parsons asked about her availability, Ms. Loew would respond inquiring about the terms of her engagement, particularly "a timetable." While Ms. Benezet-Parsons continued to try to nail down dates and flights, Ms. Loew contends she remained "available in theory[,] until all of the necessary of the contracting puzzle were put in place." Finally, she says that, on November 18, 2016,[2] Ms. Benezet-Parsons acknowledged that she "now understood" that Ms. Loew had not been provided with a daily rate, or even a consulting agreement. She promised to respond by November 21 and did so in offering Ms. Loew a "base labor rate of $655."

Ms. Loew expressed "shock" at what she contends was an unacceptably low offer. She asserts that it failed to account for the fact that USAID was willing and able to compensate DAI for "indirect costs" as part of the contract and thus were able to pay her more. She attempted to show Ms. Benezet-Parsons all the indirect costs, like providing Medicare and standard corporate benefits, that Ms. Loew was being asked to "absorb," but which

---

[2] The complaint, in an obvious typographical error, designates the year as "2019." (ECF No. 1, ¶ 41).

they could instead bill to USAID.  She argues this number belied a misunderstanding of USAID policy and regulation and would have left her with only $392 per day after she absorbed indirect costs. Sensing an "untenable situation," she reached out to Dr. Bond for help.  In response, Dr. Bond explained he would "fully support" Ms. Loew as DAI's agent because she was "invaluable" to the proposal and would have "invaluable" contributions to the project. However, quoting his various responses via text and email, she shows he otherwise expressed ambivalence.  For instance, he texted her initially, "Do what you need/want to do. If you can't reach an agreement, so be it."  Eleven days letter he emailed, "As I said, if it doesn't work for you, it doesn't work. I will miss ou [sic] and the important contribution you would have made."  The remaining two messages adopt a similar sentiment: he would miss her as part of the project, but that he understood her decision on an agreement with DAI. Ultimately, negotiations seem to stall out and stop entirely when Ms. Benezet-Parsons made it clear that "$655 was the maximum, drop-dead number."

Ultimately, Ms. Loew did not agree to the $655 rate.  Although she does not expressly say DAI moved on without her (her narrative simply ends), it is implied in the fact she is bringing these claims.  As final proof that this offer was not made in good faith or with a full understanding of industry practice or USAID policy, Ms. Loew points to a later "short-term" contract she was offered

with DAI in July 2017.  Here she initially asked for a daily rate over $900.  She does not explain the specifics of this project but explains her "price proposal" was "functionally the same as she attempted to demonstrate in November 2016."  She claims Dr. Bond told colleagues that the price requested was "not at all unreasonable" and a different DAI employee ultimately offered her $840, even though she accepted $825 to afford DAI "a small profit."

On November 21, 2019, Ms. Loew brought a complaint against DAI, as it relates to her work in 2016, for breach of contract, unjust enrichment, bad faith "negotiations" and unconscionability as contract claims, and for conversion, fraud and negligence in tort. (ECF No. 1, at 15-17).  On January 29, 2020, DAI filed a motion to dismiss arguing that Plaintiff failed to state a single claim in her complaint.  (ECF No. 22).  On March 11, 2020, Ms. Loew filed an opposition, attempting to add a quantum meruit claim. (ECF No. 28).  DAI replied on March 25, 2020.  (ECF No. 29).

## II.  Standard of Review

A motion to dismiss under Fed.R.Civ.P. 12(b)(6) tests the sufficiency of the complaint. *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).  In evaluating the complaint, unsupported legal allegations need not be accepted. *Revene v. Charles Cty. Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989).  Legal conclusions couched as factual allegations are insufficient, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), as are conclusory

7

factual allegations devoid of any reference to actual events. *United Black Firefighters of Norfolk v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979); *see also Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not 'show[n]' - 'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed.R.Civ.P. 8(a)(2)). Thus, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* At this stage, an outside document can only be considered when it is "integral to and explicitly relied on" in the complaint *and* "the plaintiffs do not challenge its authenticity." *Philips v. LCI Intern, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999) (citing *Parrino v. FHP, INC.*, 146 F.3d 699, 705-06 (9th Cir. 1998) ("A district court ruling on a motion to dismiss may consider documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading.") (internal quotation marks omitted)).

Generally, *pro se* pleadings are liberally construed and held to a less stringent standard than pleadings drafted by lawyers. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)); *Haines v. Kerner*, 404 U.S. 519,

520 (1972).  However, courts, well beyond the smattering cited by
DAI and including the Eastern District of Virginia, have declined
to extend such leniency to *pro se* parties who are practicing or
licensed attorneys.  *See Fitistics, LLC v. Cherdak*, No. 1:16-cv-
112-LO-JFA, 2018 WL 4059375 (E.D.Va. August 23, 2018) (citing
*Tatten v. City and Cty. of Denver*, 730 F.App'x. 620, 625 (10th Cir.
2018) (collecting cases from its own circuit and the Second, Fifth,
Sixth and Seventh circuits)) ("[*pro se* party] is not entitled to
the consideration normally afforded to *pro se* parties who lack
familiarity with the law, the court system, and its policies and
procedures").  This caselaw is persuasive on the issue.  As a
practicing  attorney,  Ms.  Loew  is  entitled  to  no  special
consideration in judging the sufficiency of her complaint.

## III. Choice of Law

In federal diversity cases, a court must apply the choice of
law rules of the forum state.  *Klaxon Co. v. Stentor Elec. Mfg.
Co.*, 313 U.S. 487, 497 (1941).  Ms. Loew asserts that the "many
Maryland  events"  involved  and  "DAI's  standard  form  consulting
agreement" suggest Maryland law should apply.  (ECF No. 28-1 at
17).  However, she ultimately acquiesces in Defendant's reliance
on Maryland's choice of law rules in applying Virginia law to
Plaintiff's breach of contract, quasi contractual claims and tort
claims.  (*Id.*); (ECF No. 22-1, at 16-18).  DAI's choice of law

analysis reaches the correct result, despite not fully squaring its choice of law principles with the facts at hand.

Under Maryland rules, tort claims are governed by the law of the state where the injury was suffered, not where the wrongful act took place. *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 511 (4th Cir. 1986); *see also Philip Morris Inc. v. Angeletti*, 358 Md. 689, 744 (2000). In determining which law to apply to contract claims, Maryland courts apply *lex loci contractus*, the law of the place where the contract is made. *See e.g. Allstate Ins. Co. v Hart*, 327 Md. 526, 529 (1992). A "contract is made where the last act necessary to make the contract binding occurs." *Riesett v. W.B. Doner & Co.*, 293 F.3d 164, 173 n.5 (4th Cir. 2002). An exception applies when the applicable foreign law runs counter to a "very strong" public policy of the state. *Kramer v. Bally's Park Place, Inc.*, 311 Md. 387, 390 (1988) (collecting cases); *see also Am. Motorists Ins. Co. v. ARTRA Group, Inc.*, 338 Md. 560, 573 (1995).

While Defendant is right to "assum[e] for choice of law purposes that a contract was formed" as it relates to the contract claims, (ECF No. 22-1, at 17), it does not fully address quasi-contractual claims where the very existence of a contract is in question and the last act unclear. DAI relies on *RaceRedi Motorsports, LLC v. Dart Machinery, Ltd.*, 640 F.Supp. 2d 660, 665 (D.Md. 2009), in arguing *lex loci contractus* applies to a claim

for unjust enrichment.  However, in *RaceRedi*, the parties agreed a contract existed but disputed its scope.  640 F.Supp.2d at 663. Similarly, *Elliot AmQuip LLC v. Bay. Elec. Co., Inc.*, applied the principle to unjust enrichment and *quantum meruit* claims, but, there again, the contract's existence was not in dispute.  No. ELH-10-3598, 2011 WL 2174893 at *1 (D.Md. June 2, 2011) (citing *Konover Prop. Tr., Inc. v. WHE Assocs., Inc.*, 142 Md.App. 476, 490-92 (2002)).

Nevertheless, although Defendant cites no caselaw on this point, there is some support for the proposition that *lex loci contractus* applies to quasi-contract claims based on an implied contract theory.  *Konover,* 142 Md.App. at 492 (rejecting the argument that *lex loci contractus* did not apply to claims of an implied contract, unjust enrichment, *quantum meruit* and detrimental reliance simply because it was "difficult to ascertain precisely the last action necessary to make a contract binding in a quasi-contractual setting").  Where Maryland courts have rejected the use of *lex loci contractus* on these grounds, however, they have instead relied on the Second Restatement of Conflict of Laws.  *See e.g. In re Baltimore Emergency Services II*, 401 B.R. 209 (Md. L.B.R. 2008) (citing *Taylor v. Grafton*, 273 Md. 648, 660 (1975)) (finding "no Maryland case applying choice of law principles to an alleged quasi-contract").  The Restatement looks to "the local law of the state where the contract requires the

11

services . . . be rendered, unless . . . some other state has a more significant relationship to the transaction and the parties" in which case the other state's law applies.  Restatement (Second) of Conflicts of Laws § 196 (1971).

Whether the Restatement or *lex loci contractus* apply to the quasi contractual claims, however, Defendant is right to apply Virginia law to all of Plaintiff's claims.  Here the injury to plaintiff took place in Virginia, meaning that Virginia tort law applies.  If a contract is presumed, the last act of acceptance would have occurred in Virginia where Ms. Loew resides.  There is no Maryland public policy that would council against applying Virginia law here.  If *lex loci contractus* does not apply to the claim of unjust enrichment and the Restatement test is used instead, Ms. Loew rendered her services from Virginia, where she works and lives.  (ECF No. 1, ¶1).  While Maryland and Delaware may have an interest in the litigation as it affects DAI's members as citizens, (ECF No. 12), their interest is not more significant than Virginia's interest in protecting the rights of Ms. Loew as a citizen and as host to a large portion of the conduct in question.

## IV.  Analysis

### A.  Breach of Contract[3]

Ms. Loew fails to state a claim for breach of contract.  "To state a valid claim for breach of contract under Virginia law, a plaintiff must claim that the defendant owed it a legal obligation, the defendant violated that obligation, and, as a consequence, injury or damage inured to the plaintiff." *Frank Brunckhorst Co., LLC. v. Coastal Atl., Inc.*, 542 F.Supp.2d 452 (E.D.Va. 2008) (citing *Caudill v. Wise Rambler, Inc.*, 210 Va. 11, 13 (1969)).  To form a valid and enforceable contract, "there must be mutual assent of the contracting parties to terms *reasonably certain* under the circumstances." *Allen v. Aetna Cas. & Sur. Co.*, 222 Va. 361, 364 (1981) (emphasis added).  "A contract involves a bilateral exchange, a meeting of the minds, and an understanding of obligations undertaken." *Jones v. Peacock*, 267 Va. 16, 20 (2004).

---

[3] Defendant is wrong to claim Ms. Loew has abandoned her claim of an "express" contract. (ECF. No. 29, at 9).  It relies on an overly technical reading of a single header in her opposition: "Material Breach of a Contract Implied in Fact," (ECF No. 28-1, at 25) and its own misstatement of law. (ECF No. 28-1, at 9).  Express and implied-in-fact contracts are not distinguished by whether they are "reduced to writing or not."  (ECF No. 29, 9).  The very case to which Defendant relies says, under Virginia law, an express contract can be written *or* oral, but is "no different" than "implied-in-fact" contract except that the latter relies on "terms and conditions [] implied in law from the conduct of the parties." *Spectra-4, LLP v. Uniwest Com. Realty, Inc.*, 290 Va. 36, 43 (2015).  Moreover, under either theory, the basics of contract formation apply. *Id.*  Lastly, Ms. Loew implicitly refutes this claim in her opposition itself. (ECF No. 28-1, at 9).

A contract that is "too vague and indefinite" provides no basis for a remedy and therefore is unenforceable. *Id.* (citing *Valjar, Inc. v. Mar. Terminals,* 220 Va. 1015, 1018 (1980); *Progressive Constr. Thumm*, 209 Va. 24, 30-31 (1968)). "It is well settled under Virginia law that agreements to negotiate at some point in the future are [also] unenforceable." *Beazer Homes Corp. v. VMIF/Anden Southbridge Venture*, 235 F.Supp.2d 485, 490 (E.D.Va. 2002) (collecting cases). To bind a principal, an agent must be acting with either actual authority, "where *the agent* reasonably believes, in accordance with the principal's manifestations to the agent" or apparent authority, "when a *third party* reasonably believes the actor has authority to act on behalf of the principal . . . traceable to the principal's manifestations" in forming an agreement. *Rahbar v. Law Office of Arquilla & Poe, PLC*, 1:19-cv-1475, 2019 WL 1575191 at *10 (E.D.Va. April 11, 2019) (citing Restatement (Third) of Agency §2.01).

To start, any understanding between Ms. Loew and Mr. Bond as to compensation for her work on the proposal that predates a time when Mr. Bond was acting as an agent for DAI are not imputed to DAI. The amended complaint expounds events leading to the "agreement" with Mr. Bond that was the basis for her work on the proposal and which is "memorialized" in text messages between the two. (ECF No. 1, ¶ 7). Although "not articulated expressly," she said the "consideration for the proposal work she offered Mr. Bond

was understood to be" two-fold: (1) "compensation for the days she worked on task order at a market rate" consistent with the "highest" rate USAID would permit of someone of her "particular skill and experience" and (2) "for an appropriate amount of time over the life of the take order to perform the work called for" (*Id.*, ¶ 9). However, at the time, Mr. Bond was working for another firm, not DAI. (*Id.*, ¶ 10). Even with Plaintiff's inference that Mr. Bond was an agent for DAI when he began "spearheading their proposal on or about May 5, 2016" as true,[4] any implicit and prior understanding as to an agreement between Ms. Loew and Dr. Bond preceding this date cannot be imputed to DAI.

However, Ms. Loew describes enough of her communications with Dr. Bond to show that the subsequent promises he allegedly made to her once he was ostensibly an agent for DAI were supported by either apparent or actual authority. Ms. Loew contends that Dr. Bond and DAI reached an agreement that DAI would hire on his team for the proposal and would "employ his team if the proposal was successful." (ECF No. 1, ¶ 15). If true, he would be reasonable in his belief that he had the authority to pick his team and push for their employment. Even if not, DAI reached out to her for input on the "analysis" portion of the proposed "statement of work"

---

[4] Ms. Loew explains in an opposition header that she was not an employee of Dr. Bond but a "Member of a Loosely Formed Team He Had Assembled." (ECF No. 28-1, at 14).

and "pressed [her] frequently for dates on which she would be able to travel to Kyiv to commence work."[5]   (ECF No. 1, ¶ 28).   Such conduct by DAI granted Dr. Bond apparent authority as it was not unreasonable for Ms. Loew to believe he had the authority both to secure her work on the proposal and to select her for placement onto the project.   Moreover, the promises Dr. Bond allegedly made to Ms. Loew before and after Dr. Bond became DAI's agent appear substantially the same.   Prior to working with DAI, Dr. Bond

---

[5] Defendant attached a chain of emails between Ms. Benezet-Parsons and Ms. Loew to its motion to dismiss.   It argues that Plaintiff has quoted from them, so they are integral and relied upon in her complaint and properly before us.   However, Plaintiff here challenges the authenticity of all but one of the individual emails in the chain. (ECF No. 28-1, at 17).   Strangely, she does not identify exactly which email, relied upon by DAI, she believes to be authentic, but seemingly implies it is the November 18 email relied upon most directly in her complaint. (ECF No. 1, ¶ 41-42).   She argues the rest are not self-authenticating under Fed.R.Evid. 902-903. (ECF No. 28-1, at 19). Ms. Loew is correct that this November email is the "sole email" from Ms. Benezet-Parsons from which she quotes directly, (ECF No. 28-1, at 18). However, in her complaint, she expressly refers to her email responses to and from Ms. Benezet-Parsons on specific subjects, (ECF No. 1, ¶ 49-46), with reference to certain dates (*Id.*, ¶ 41, 43, 46).   Moreover, Defendant's "Attachment A" to its motion to dismiss puts forward only a single email chain encapsulating the entirety of this back and forth between the two.   This email correspondence is evidence that was expressly relied upon in, and integral to the complaint.   As DAI suggests, the rule of completeness would counsel for inclusion of the entire chain. (ECF No. 29, at 5) (citing Fed.R.Evid. 106).   DAI further argues that Ms. Loew's challenge of these emails' authenticity is baseless. (ECF No. 29, at 6).   However, it is not necessary to weigh-in on whether the authenticity challenge is made in good faith.   The entirety of the email chain adds little to the facts as summarized in the complaint.   Only the facts set forth in the complaint are considered herein.

initially told her she would be compensated for any future work on the proposal with a position on the team if the firm with which Dr. Bond was working won.  (ECF No. 1, ¶ 7).  As Ms. Loew alleges that DAI then hired Dr. Bond and granted him the ability to pick his team should it win the bid.   Although included in a section on on "Fraud and Negligence" as a "cause of action," (ECF No. 1, ¶ 69(d)), Ms. Loew also alleges that from her work done shortly after this to the award, Dr. Bond "expressly and impliedly" promised her "repeatedly" that he would ensure that she would get compensated for her work done to date with "meaningful, market rate consultancy."  (ECF No. 1, ¶ 69(d)).  This dual promise, therefore, can be imputed to DAI.

Nevertheless, Dr. Bond, as DAI's agent, and Ms. Loew did not spell out the central terms of either "consideration": payment for her work to date and payment as a hire for the project.  Therefore, while Plaintiff may have alleged sufficiently that there was mutual assent between the two that Ms. Loew would be compensated in some form on both fronts, there is no alleged "meeting of the minds" as to the central terms of Ms. Loew's employment, particularly her pay.[6]   In fact, Ms. Loew makes no allegations that she pursued

---

[6] Ms. Loew does not assert a prior course-of-dealing with DAI which would allow such a price to be implied, although she argues industry custom would supply a much higher one than offered, if not exactly what she requested.  (ECF No. 28-1, at 21).  In fact, her subsequent dealing with DAI belies such uniformity in dealings

compensation for her work on the proposal in negotiating directly with DAI, either before or after she attempted to secure placement on the project itself.  As to this placement, Ms. Loew and DAI failed to move beyond preliminary negotiations over her hiring, despite her expectation that it was forthcoming.  As her complaint also highlights, Ms. Benezet-Parsons responded to Ms. Loew on November 18, 2016, highlighting the lack of any such agreement while laying out the potential terms they could offer should they hire her on.  (ECF No. 1, ¶ 41).  This email, as the starting point for their subsequent negotiations, represents the classic agreement to agree that belies the formation of an actual contract. In her conversations with Ms. Benezet-Parsons she was, in her own words, "unwilling to commit to a timetable before a good faith consulting agreement was offered and accepted."  (ECF No. 1, ¶ 40).  In fact, Ms. Loew, by her own admission, never accepted DAI's explicit offer.  Even if her response is not construed as a counteroffer, DAI refused to modify its initial offer to the higher per day labor rate Ms. Loew requested.  Likewise, she refused ever to accept their initial offer as too low.  A contract was not

---

in that she alleges DAI offered her more for a similar "short-term contract" in July 2017, but significantly less than she initially asked for, and more than what she ultimately agreed to.  (ECF No. 1, ¶ 62).

formed: either in compensating Ms. Loew for her proposal work or in hiring her onto the project.

Ms. Loew was fully aware that she and DAI might not ultimately come to an agreement.  There was no explicit assurance of either form of consideration in her agreeing to take part in the proposal, even if done "on spec." (ECF No. 1, ¶ 8).  Ms. Loew concedes upfront she "had never been offered a formal consulting or employment agreement [from DAI] with all terms of engagement." (ECF No. 1, ¶ 31).  While stating it "was never convenient" to discuss such an agreement, Ms. Loew admits she actively avoided any firm commitment to DAI as to a potential start date as these dates "would most likely be determined to be binding." (*Id.*, ¶¶ 28, 30).  She insists, nevertheless, that a contract was implied as "[s]he would not have agreed to work on the proposal if she had not believed that [DAI] . . . would deal with her in anything but the best of faith." (*Id.*, ¶ 34).  Even with bad faith in negotiating, there can be no breach without a contract.

In fact, Ms. Loew herself alleges facts that show a clear offer made by Ms. Benezet-Parsons on behalf of DAI that she never accepted, even accepting her bald legal assertion that she was "[c]areful not to phrase her response in the form of a rejection or a counteroffer." (ECF No. 1, ¶ 46).  As the complaint explains, Ms. Loew was "shocked" that Ms. Benezet-Parsons "offered her nothing more than a base labor rate of $655." (ECF No. 1, ¶ 44).

19

In turn, Ms. Loew never accepted this offer in that she felt the offered price "was not reasonable" due to the costs she would have to absorb.  (ECF No. 1, ¶ 55).   Plaintiff admits that "she made no decision," because she felt the "offer was ridiculous" and that they were at an "impasse."  (ECF No. 1, ¶ 57, 60).   Indeed, the parties ultimately got no further toward an actual meeting of the minds as to the compensation owed Ms. Loew: DAI made clear that "$655 was the maximum, drop-dead number" it was willing to provide her.  (ECF No.1, ¶ 61).   Nowhere does she allege that she accepted this offer.  In fact, she alleges that the DAI offer emanated from a "misunderstanding of USAID's regulations on contractor pay." (ECF No. 1, ¶¶ 47-61).  Ms. Loew attempted to correct this alleged misunderstanding in working toward a contract, but to no avail. Here she seems to allege a violation of "USAID policy and even law" in not offering her more but alleges no actual cause of action under such policy.  (ECF No. 1, ¶61, ¶69).   Even in spelling out her "Breach of Contract" claim, Ms. Loew alleges DAI "failed to compensate Petitioner for her invaluable work on its winning proposal . . . *by failing to offer her a consulting agreement at market rates*."  (ECF No. 1, ¶ 69(a)).  Although she alleges that Dr. Bond "repeatedly" had promised her compensation as mentioned, she fails to allege virtually *any* specific terms of such promises other than her own calculations as to fair pay based on her experience on USAID projects.   Such allegations show there was no

meeting of the minds or mutual assent here.  Ms. Loew has effectively negated a central element of her own claim.  Her breach of contract claims will be dismissed.

### B.  Quantum Meruit

For the first time in her opposition to DAI's motion to dismiss, Ms. Loew raised a claim of quantum meruit seeking to recover "based on an implied contract."  (ECF No. 28-1, at 24).  An allegation not raised in the complaint is not properly considered here.  However, the court must decide whether Ms. Loew should be granted leave to amend her complaint to add this additional claim.  The Federal Rules of Civil Procedure provide that a party may amend a pleading as a matter of course within 21 days of serving it.  Fed.R.Civ.P. 15(a)(1).  Once the right to amend as a matter of course expires, as it has in this case, "a party may amend its pleading only with the opposing party's written consent or the court's leave."  Fed.R.Civ.P. 15(a)(2).  Denial of leave to amend should occur "only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile." *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir.1986); *see also Mayfield v. National Ass'n for Stock Car Auto Racing, Inc.*, 674 F.2d 369, 379 (4th Cir. 2012).  An amendment is futile if it could not withstand a motion to dismiss.  *See Perkins v. U.S.*, 55 F.3d 910, 917 (4th Cir. 1995).

Under Virginia law, quantum meruit makes out nearly the same quasi-contractual claim as unjust enrichment: a plaintiff must show she rendered "valuable services" to a defendant who was similarly on notice that the "claimant, in performing the work, expected to be paid by the defendant." *Raymond, Colesar, Glaspy & Huss, P.C. v. Allied Cap. Corp.*, 961 F.2d 489, 490-91 (4th Cir. 1992) (citing *Humphreys Railways, Inc. v. F/V Nils S.*, 603 F. Supp. 95, 98 (E.D.Va. 1984)).  To qualify for this equitable remedy, the defendant must not only have accepted the valuable services, but also have *requested* them in forming an implied contract. *Raymond*, 961 F.2d at 491 (explaining this remedy cannot apply to the same subject matter as an express contract).  The remedy's scope is limited to "damages amounting to the reasonable value of the work performed, less the compensation actually received for that work." *T. Musgrove Constr. Co., Inc. v. Young*, 840 S.E.2d 337, 341 (Va. 2020) (citing *Mongold v. Woods*, 278 Va. 196, 203 (2009)).

Here, as explained, DAI was on notice of Ms. Loew's invaluable addition to Dr. Bond's team having agreed to have Dr. Bond "and his associates" onto the proposal and, as Ms. Loew alleges, "employ his team if the proposal was successful." (ECF No.1, ¶ 15).  In doing so, DAI clearly sought out Dr. Bond and his expertise, which included his expertise in staffing a team for the proposal and project.  While there is no allegation that DAI knew of Ms. Loew's potential contribution to this team at this initial juncture, she

alleges they eventually reached out directly to her to "gather all of the information they needed to conduct the due diligence USAID required before proposing her." (ECF No.1, ¶ 9). She further alleges that DAI worked in tandem with Dr. Bond as their agent to have Ms. Loew "significantly contribute to a statement of work that would define her role" and she provided responses to numerous technical issues directed to her "long before" the proposal was due for submission. (ECF No.1, ¶17). It is clear from such allegation that granting leave for Plaintiff to amend the complaint as it relates to her claim of quantum meruit would not be futile. She may seek to amend in adding this claim.[7]

### C.  Unjust Enrichment

This portion of the complaint states a claim as it relates to unjust enrichment. (ECF No. 1, ¶ 69(c)). In many ways, an unjust enrichment claim begins where a breach of contract claim ends. "The cause of action for unjust enrichment . . . applies as

---

[7] The complaint itself is ambiguous as to how far back Ms. Loew alleges she worked on the proposal on DAI's behalf in seeking unjust enrichment and quantum meruit relief. However, as mentioned, beyond identifying key experts and essential personnel, there was little to no work done on the proposal prior to Dr. Bond agreeing to work with DAI in May. (ECF No. 1, ¶ 14). Ms. Loew's opposition, however, seeks "Quantum Meriut" [sic] "[b]ecause Petitioner had provided substantial services to DAI between May and August 2016, which allowed it to win a contract for which it otherwise would not have been competitive." (ECF No. 28-1, at 24). Therefore, any quantum meruit or unjust enrichment for which Plaintiff may be entitled after amendment is confined solely to this period and does not include any alleged work done prior to Dr. Bond becoming an agent of DAI in May.

follows: (1) '[plaintiff] conferred a benefit on [defendant]; (2) [defendant] knew of the benefit and should reasonably have expected to repay [plaintiff]; and (3) [defendant] accepted or retained the benefit without paying for its value.'" *T. Musgrove,* 840 S.E.2d at 341 (quoting *Schmidt v. Household Fin. Corp.,* II, 276 Va. 108, 116 (2008)). Where some quasi-contractual claims like "quantum meruit require a request for services, unjust enrichment does not." *Fessler v. Int. Bus. Machs. Corp.*, 959 F.3d 146, 157 (4th Cir. 2020) (citing *T. Musgrove* 840 S.E.2d at 341 ("When the defendant has not requested the plaintiff's services, a plaintiff's claim is for unjust enrichment.")). A plaintiff is entitled to recover up to the "benefit realized and retained by the defendant." *T. Musgrove*, 840 S.E.2d at 341 (*citing Schmidt*, 276 Va. At 116)).

Ms. Loew alleges that her work was central to the proposal that DAI put forth to USAID in a bid and "was acknowledged to be one of the keys to winning" that bid. (ECF No. 1, ¶ 8). She asserts that USAID itself had her listed as "essential personnel" on the task order under "the terms of the request for proposals" it released. (*Id.*). In return, she expected to be compensated for her market value adjusted according to USAID policy, both for her work completed and her work to come on the project itself. (*Id.*, ¶ 9). Whether her assuredness in her future placement on the project was misplaced, there is little dispute that Ms. Loew conferred a benefit on the work proposal in spending months working

24

"on spec" and in being a recognized and substantial factor in DAI's winning bid. (*Id.*, ¶ 8). DAI knew of Ms. Loew's contribution to this proposal, particularly because she was "acknowledged" as a key factor in winning the bid and because she was included as an "essential personnel" on the task order. Lastly, DAI not only incorporated Ms. Loew's work into its own bid but used that bid to secure the project. DAI clearly accepted and retained the benefit of her work. She has pled all the essentials of an unjust enrichment claim and DAI's motion to dismiss this claim will be denied.

### D.    Other "Causes of Action"

It is not entirely clear if Ms. Loew entirely abandons her tort or fraud claims as Defendant's reply asserts, (ECF No. 29, at 2), or her claim for "Bad Faith Negotiations and Unconscionability." (ECF No. 1, ¶ 69(b),(c),(d)). In addition to the three claims put forth above, her opposition simply reasserts the "other 'causes of action'" laid out in her complaint. However, she concedes they do not form independent causes of action but can provide "factors aggravating and resulting from the breach" where "independent, willful torts" have been committed. (ECF No. 28-1, at 25). In turn, she argues they form an independent "basis for Petitioner's claim of punitive damages," beyond the mere breach of

contract.[8] (ECF No. 28-1, at 25) (citing *17th St. Assocs. V. Markel Int'l Ins.*, 373 F. Supp.2d 584, 599 (E.D.Va. 2005)).   In finding these claims to state no such independent torts, it is not necessary to reach whether such claims would be relevant to any eventual question of damages.

### 1.   Bad Faith Negotiations and Unconscionability

Ms. Loew's claims of bad faith negotiations and unconscionability do not give rise to independent torts or contract claims.   "Under Virginia Law, every contract contains a covenant of good faith and fair dealing; however, a breach of those duties only gives rise to a breach of contract claim, not a separate cause of action." *Albayero v. Wells Fargo Bank, N.A.*, No. 3:11CV201-HEH, 2011 WL 4748341 at *6 (citing *Brunckhorst*, 542 F.Supp.2d at 462; *Charles E. Brauer Co., Inc. v. NationsBank of Va., N.A.*, 251 Va. 28, 33 (1996)).   Similarly, "there is no tort cause of action for bad faith in Virginia." *Harris v. USAA Cas. Ins. Co.*, 37 Va. Cir. 553, at *11 (Va.Cir.Ct. 1994).   Alternatively, unconscionability, like mutual mistake or duress, is simply a defense to an otherwise valid agreement. *Black v. Powers*, 49 Va.App. 113 (2006) (citing Restatement (Second) of Contracts §

---

[8] DAI correctly clarifies that such an independent basis is necessary to recover punitive damages precisely because "punitive damages are not available in Virginia for breach of a contractual duty." (ECF No. 29, at 13) (citing *Kamlar Corp. v. Haley*, 299 S.E.2d 514, 518 (Va. 1983)).

152).   Therefore, it likewise does not establish an independent cause of action.   Here the allegation that Defendant operated in bad faith speaks only to whether DAI violated an implied covenant of good faith inherent in any contract and therefore only goes to whether Defendant generally breached a contractual duty owed to Plaintiff.   On the other hand, a claim of "unconscionability" would only serve as a defense if a contract between Loew and DAI is found.   Neither states a cause of action.   This allegation fails to state a claim and is hereby dismissed.

### 2. Conversion

Bundled with the unjust enrichment claim in the complaint is a tort claim for conversion.   (ECF No. 1, ¶ 69(c)).   As to conversion, Ms. Loew fails to state a claim. Under Virginia Law, "[a] person is liable for conversion for the wrongful exercise or assumption of authority over another's goods, depriving the owner of their possession, *or* any act of dominion wrongfully exerted over property in denial of, or inconsistent with, the owner's rights." *Simmons v. Miller*, 261 Va. 561, 582 (2001). "In general, a cause of action for conversion applies only to tangible property. However, many courts have recognized the tort of conversion in cases where intangible property rights arise from or are merged with a document, such as a valid stock certificate, promissory note, or bond." *United Leasing Corp. v. Thrift Ins. Corp.*, 247 Va. 299, 305 (1994).

While there is disagreement as to the scope of property that falls under Virginia's conversion law, all agree that this cause of action involves the *unauthorized* use of property. Some courts have subsequently argued that the types of "intangible property subject to conversion is not exhaustive" even though *United Leasing Corp.* was narrowly focused on a "document evincing title or other proof of the right of ownership." *See e.g.*, *E.I du Pont De Nemours and Co. v. Kolon Indus., Inc.*, No. 3:09cv58, 2011 WL 4625760 at *4 (E.D.Va. October 3, 2011). The district courts in Virginia are divided on the matter. The Western District has held that intangible property "cannot be converted absent its merger with a document evidencing title." *E.I. du Pont*, No. 3:09cv58 at *4 (citing *Hinkle Oil & Gas, Inc. v. Bowles Rice McDavid Graff & Love, LLP*, 617 F.Supp.2d 447, 453-55 (W.D.Va. 2008)). The Eastern District, on the other hand, has recognized intangibles well outside this category of property. *E.I. du Pont*, No. 3:09cv58 at *4 (citing *In Re Outsidewall Tire Litig.*, 748 F.Supp.2d 557 (E.D.Va. 2010) (blueprints were convertible property); *Combined Ins. Co. of Am. V. Wiest*, 578 F.Supp.2d 822 (W.D.Va. 2008) (a company's targeted-recruitment list was convertible property)); *but cf. Tire Eng'g and Distrib., LLC. v. Shandong Linglong Rubber Comp., LTD.*, 682 F.3d 292, 310 (4th Cir. 2012) (arguing blueprint conversion claim was not preempted by the Copyright Act only where there is "unlawful retention of the tangible object embodying its

work."). Where the Virginia courts agree is that a conversion claim must involve the use of property "*without the consent of the owner.*" *Nossen v. Hoy*, 750 F.Supp. 740, 743 (E.D.Va. 1990) (emphasis added) (collecting cases).

It is not necessary to resolve whether Virginia's conversion law covers Ms. Loew's intellectual property as incorporated into the proposal (as a tangible document) as she *consented* to its use in securing DAI's involvement in the USAID project. "Per agreement" with Bond, she expected she "would be compensated for her work on the proposal with a position on the task order" if "the firm with which Bond was working" was awarded the project. (ECF No. 1, ¶ 7). However, as mentioned, this initial understanding was made solely between Mr. Bond and Ms. Loew and nowhere does she allege that she objected to the use of her work in the proposal even as Mr. Bond began to speak with DAI about "spearheading their proposal." (ECF No. 1, ¶ 15). The *entirety* of Ms. Loew's negotiations with DAI, in fact, occurred *after* it had incorporated Ms. Loew's work, with her help, into a winning proposal. (*Id.*, ¶ 37). Prior to and leading up to DAI's submission of the proposal to USAID, Ms. Loew, by her own admission, "was not especially concerned about the consulting agreement she would be offered." (*Id.*, ¶ 34).[9] Further, she does not actually allege

---

[9] She attributes this to her apparent confidence that whatever deal she could secure with DAI would be to her satisfaction. (*Id.*)

DAI exceeded its authorized use of her eventual work in the complaint itself.  For the first time, in her opposition she instead argues that DAI was "not entitled to appropriate the intellectual property of Ms. Loew." (ECF No. 28-1, at 15).  As Ms. Loew is herself an attorney, the court declines to read her complaint so liberally to infer this allegation is made out in the original complaint.

In any event, amendment as to this count would be futile. The complaint itself shows she willingly incorporated this information into the proposal when requested by DAI.  She alleges simply that DAI "could not have won the task order competition," "[h]ad [Plaintiff] not contributed to its proposal." (ECF No. 1, at 15-16).  Even assuming this to be true, it never used her work, as contained in the proposal, without her consent.  Even if the project was built around the proposal, as the proposal itself anticipates, it is unclear that this is even the kind of unauthorized use of intellectual property that conversion prohibits.  There is no suggestion her sections were later lifted verbatim and incorporated into the actual project or that separating out where Ms. Loew's intellectual property began and

others end, as it relates to the proposal, is even possible.  The conversion claim must fail.[10]

### 3.   Fraud and Negligence

Plaintiff claims both fraud and negligence as it relates to an alleged failure of Dr. Bond, as an agent for DAI, in "refusing to seek intervention by an authority higher than Benezet-Parsons" in moving her contract negotiations along and in "expressly and impliedly" promising her market-rate compensation. (ECF No. 1, ¶ 69(d)).  She also claims a separate theory of negligence by both Ms. Benezet-Parson and Dr. Bond as agents of DAI.  Although naming Dr. Bond, this allegation seems to center solely around Ms. Benezet-Parsons's "misunderstanding of USAID policy and requirements" and her failure properly to "vet" the issue with her "chain of command."  (ECF No. 1 ¶ 69(e)).

The fraud claim is frivolous and is dismissed.  As DAI correctly states, to plead fraud properly under Virginia Law, a plaintiff must allege: "(1) a false representation of a material fact, (2) made intentionally and knowingly, (3) with intent to mislead, (4) reliance by the party misled, and (5) resulting damages to the party misled." *Advanced Res. Int'l, Inc. v. Tri-Star Petrol. Co.*, 4 F.3d 327, 335 (4th Cir. 1999) (citing

---

[10] The court also declines to grant leave to amend the complaint as to this claim that DAI subsequently "misappropriated" her intellectual property as such a bald legal assertion would not save the claim from futility.

*Nationwide Mut. Ins. Comp. v. Hargraves*, 242 Va. 88, 91 (1991)). As DAI also correctly notes, the Fourth Circuit has explained that Virginia law is clear in differentiating between a fraud and breach of contract claim. *Lissmann v. Hartford Fir Ins. Co.*, 848 F.2d 50, 53 (4th Cir. 1988). "*Colonial Ford* distinguishes between a statement that is false when made and a promise that becomes false only when the promiser later fails to keep his word. The former is fraud, the latter is breach of contract." *Id.* (citing *Colonial Ford Truck Sales, Inc. v. Schneider*, 228 Va. 671, 677 (1985)).

Here, even if Dr. Bond's promises can be imputed to DAI, they were not false when made; they only became untrue when Dr. Bond, and by extension DAI, failed to keep his word. This sounds in contract as dealt with above and is not a claim of fraud. The claim of fraud is dismissed.

The exact theories of negligence, however, are harder to discern but Ms. Loew appears to state (1) negligent misrepresentations made by Dr. Bond that she would be compensated for her work, and (2) that Dr. Bond and Ms. Benezet-Parsons were negligent in their negotiations to hire her. (ECF No. 1, ¶ 69(d),(e)). These claims, too, must be dismissed.

In alleging negligence, Ms. Loew can point to no duty she was owed by DAI outside of an alleged contractual one. The "finding of a legal duty" is a "prerequisite to a finding of negligence." *Quisenberry v. Huntington Ingalls Incorp.*, 296 Va. 233, 241 (2018)

(citing *Jeld-Wen, Inc. v. Gamble*, 256 Va. 144, 149 (1998)). Therefore, the question is a "dispositive threshold" one. *Marshall v. Winston*, 239 Va. 314, 318 (1990).  As to the first theory, Virginia law makes clear that Ms. Loew's allegation as to Dr. Bond's repeated false promises is the exact kind of "negligent misrepresentation" claim that is not separately cognizable from a contract claim. *Design and Prod., Inc. v. Am. Exhibs., Inc.*, 820 F.Supp.2d 727, 742 (E.D.Va. 2011).   As to the second theory, Virginia law has also made clear that a person alleging "injury stemming from a professional relationship" may not pursue a negligence claim where such duties arise "only by virtue of . . . contract." *Gradillas Ct. Reps., Inc. v. Cherry Bekaert, LLP*, No. 2:17cv597, 2018 WL 6626166 at *16–17 (E.D.Va. November 6, 2018). (citing *Hewlette v. Hovis*, 218 F.Supp. 2d 332, 335–37 (E.D.Va. 2004)).

Ms. Loew does not allege that either Dr. Bond or Ms. Benezet-Parsons, as business colleagues of Ms. Loew, owed her any kind of special duty of care.  The only duty she alleges they owed her arose out of an alleged contract, and, as such, they do not state claims distinct from a breach of contract.  As these allegations do not state a claim for negligence, they are dismissed.

## V.    Conclusion

For the foregoing reasons, the motion to dismiss filed by Defendant will be granted in part and denied in part.  A separate order will follow.

```
                          _____/s/_____
                          DEBORAH K. CHASANOW
                          United States District Judge
```